VIRGIN ISLANDS TELEPHONE CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Telephone & Telegraph Co. Ameritech Operations Companies, Intervenors.

VIRGIN ISLANDS TELEPHONE CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION, Respondent.

Nos. 92–1063, 92–1347.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1993.

Decided April 16, 1993.

Robert J. Aamoth, with whom Gertrude J. White was on the brief, for petitioners. Matthew J. Harthun also entered on appearance for petitioner.

James M. Carr, Counsel, Federal Communications Commission, (FCC), with whom Renee Licht, Acting Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Deputy Associate Gen. Counsel FCC, and Robert B. Nicholson and Robert J. Wiggers, Attys., U.S. Dept. of Justice, were on the brief, for respondents.

Oeter D. Keisler, Francine J. Berry, and David P. Condit entered appearances for intervenor American Tel. & Tel. Co.

Alfred W. Whittaker and Floyd S. Keene entered appearances for intervenor Ameritech Operating Companies.

Before: EDWARDS, D.H. GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Dissenting opinion filed by Circuit Judge RANDOLPH.

HARRY T. EDWARDS, Circuit Judge:

In the wake of the devastation caused by Hurricane Hugo in September, 1989, the Virgin Islands Telephone Corporation ("Vitelco" or "the company") applied to the Federal Communications Commission ("FCC" or "the Commission") for a temporary rate increase to offset anticipated reductions in demand for interstate access services. The FCC initially found the rate revision justified and authorized Vitelco to raise its rates for the first six months of 1990. However, upon completion of an investigation into the reasonableness of the revised rates, the FCC found that Vitelco had earned in excess of its authorized rate of return during the period that the interim rates were in effect. Consequently, the Commission ordered Vitelco to refund all amounts charged from January to June, 1990, in excess of its annual access rates, plus interest.

Following several failed attempts to get administrative reconsideration of the refund order, Vitelco filed these consolidated petitions for review. Vitelco maintains that the Commission's reliance on a six-month evaluation period to determine the reasonableness of the interim rates was arbitrary and capricious in this case. We agree. Throughout the administrative process, the Commission indicated that Vitelco's interim rates would be evaluated in light of their impact on the company's earnings over the standard two-year rate-monitoring period. Such an approach would have been congruent with the FCC's standard theory of rate-of-return regulation and consistent with prior Commission practice. In its ultimate decision, however, the Commission arbitrarily deviated from standard practice and employed a six-month monitoring period. Because the record reveals no reasonable justification for the FCC's action in this case, we grant the petition for review.

## I. BACKGROUND

### A. Rate of Return Prescription

The Communications Act of 1934, ch. 652, 48 Stat. 1064 (codified as amended at 47 U.S.C. §§ 151–613 (1988)), authorizes the FCC to regulate interstate telecommunications services to ensure that tariffs are just, reasonable and nondiscriminatory. 47 U.S.C. §§ 201–205 (1988). One means the Commission may use to achieve this end is the imposition of a rate of return prescription on local exchange carriers like Vitelco. *AT & T v. FCC,* 836 F.2d 1386, 1388 (D.C.Cir.1988); *see also Nader v. FCC,* 520

F.2d 182, 203–04 (D.C.Cir.1975) (the power to prescribe rates of return is "necessary for the Commission to carry out its [rate-making] functions in an expeditious manner"). The Commission's regulation of rates of return is premised on the notion that the FCC can set a target rate that balances investors' interests in competitive returns on capital against ratepayers' interests in fair pricing. *See Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). Thus, the FCC attempts to set the target rate of return high enough to "assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital," while simultaneously limiting the ability of carriers to charge ratepayers exorbitant prices. *Id.; see also AT & T,* 86 FCC 2d 221, 223 (1981). Because of changing market forces and the amorphous nature of the interests being weighed, this balancing is an imprecise science. *See United States v. FCC,* 707 F.2d 610, 618 (D.C.Cir.1983). So when the Commission exercises discretion in selecting a target rate, it is understood that the choice represents merely one point within a broad "zone of reasonableness." *AT & T,* 836 F.2d at 1390 (quoting *Jersey Central Power & Light Co. v. FERC,* 810 F.2d 1168, 1177 (D.C.Cir.1987) (en banc)).

The means by which the regulated rate of return drives actual carrier pricing is straightforward. Carriers subject to rate of return prescriptions set their service charges so that projected revenues exceed projected operating expenses by an amount that will yield the authorized rate of return. *AT & T,* 836 F.2d at 1388. If the carrier's projections prove correct, net return on capital will match the authorized return. However, because of the indeterminacy of the figures used in the calculations, carriers "will virtually never" earn precisely their authorized rate of return. *Id.; see also Communications Satellite Corp.,* 3 FCC Rcd 2643, 2647 (1988) (FCC has "long recognized the imprecision inherent in requiring carriers to set tariff rates

that will produce the exact level of revenues necessary to produce the anticipated return"). For this reason, the Commission allows for a "spread" or "buffer" range above the authorized return within which the Commission will not take remedial action. *Authorized Rates of Return for the Interstate Service of AT & T Communications and Exchange Telephone Carriers,* 58 RR 2d 1647, 1648–49 (1985) (*"Authorized Rates"*); *Communications Satellite Corp.,* 3 FCC Rcd at 2647.

To alleviate some of the imprecision inherent in the prescribed rate of return methodology, the FCC has devised several safeguards, one of which is particularly relevant to this appeal. To provide carriers with a fair opportunity to achieve their authorized rates of return, the Commission employs what it deems a "long evaluation period" allowing short-term earnings "peaks" and "valleys" to offset each other. *MCI Telecommunications Corp. v. Pacific Northwest Bell Tel. Co.,* 5 FCC Rcd 216, 217 (1990). In selecting this approach, the FCC weighed the ratepayers' interests in more frequent rate reviews (to limit the possibilities for overcharges) against the carriers' desire for longer review periods (to dampen the impact of short-term oscillations). *Authorized Rates,* 58 RR 2d at 1652. The Commission ultimately concluded that these competing interests intersect at a two-year rate-monitoring period. 47 C.F.R. § 65.701(a) (1992); *Authorized Rates,* 58 RR 2d at 1651–52. The two-year monitoring period minimizes the impact of seasonal "peak" and "valley" earnings periods. Moreover, since local exchange carriers must revise their access charges on an annual basis, *see* 47 C.F.R. § 69.3(a), they may correct for erroneous projections in the first year through rate adjustments in the second year. *See Authorized Rates,* 58 RR 2d at 1652.[1]

As originally crafted, the Commission's rate of return regulations required an automatic refund of any amount collected in excess of a carrier's authorized rate of

---

1. There appears to be no barrier to more frequent mid-course corrections. *See AT & T,* 836 F.2d at 1389 n. 1. However, this does not diminish the benefits of longer review periods since carriers may make concomitantly more corrections within the given evaluation period.

return plus the specified buffer. *See Authorized Rates*, 58 RR 2d at 1653–57. However, we rejected the *mandatory* refund rule as arbitrary and capricious, holding it inconsistent with the Commission's regulatory theory of rate-of-return prescription. *See AT & T v. FCC*, 836 F.2d at 1389. The fundamental flaw in the Commission's mandatory refund scheme was that it created a one-way ratcheting effect, forcing carriers to refund earnings accumulated in excess of their authorized return, but prohibiting carriers from recouping earnings shortfalls. *Id.* at 1390. Thus, when measured beyond the short term, carriers subject to the Commission's mandatory rate-of-return and refund regulations were virtually sure to suffer an economic loss. *Id.* at 1391.

■ Our decision in *AT & T* did not question the Commission's authority under the Communications Act to order refunds of amounts collected in violation of a rate-of-return prescription. *Id.* at 1392. That issue had been addressed in *New England Tel. & Tel. Co. v. FCC*, 826 F.2d 1101, 1107–08 (D.C.Cir.1987), *cert. denied*, 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989), where we specifically held that the Commission has authority under section 4(i) of the Communications Act, 47 U.S.C. § 154(i), to order refunds in conjunction with rate-of-return prescriptions. The decision in *AT & T*, however, emphasized that the Commission's authority to order refunds where a carrier has violated an outstanding rate-of-return prescription

> must ... be exercised in a way that does not contradict the Commission's own theory of rate of return regulation. An obvious example of a scheme that would be consistent with the Commission's view of the rate of return prescription as a minimum, is one in which the carrier, in addition to being required to return amounts that exceeded the target return, would be permitted to recover amounts by which it fell short of the target. We are confident that the Commission can imagine other schemes that would not tend to prevent carriers from earning the return needed to enable them to attract necessary capital. It is of course the Commission, not this court, that is empowered to exercise its judgment in choosing a course of action. We do not mean to suggest that any one valid course of action is preferable to any other. If the Commission's choice is to survive judicial scrutiny, however, it must conform to the Commission's understanding of its task.

*AT & T*, 836 F.2d at 1392 (citations omitted). In short, the Commission's refund mechanism must provide carriers with a fair opportunity to achieve their regulated rates of return over the long-term.

### B. *Vitelco's Interim Rates*

On September 17–18, 1989, the U.S. Virgin Islands were devastated by Hurricane Hugo. *See generally* Michael York, *Deadly Hugo Slams Puerto Rico, Virgin Islands; Storm Leaves Thousands Homeless*, WASH.POST, Sept. 19, 1989, at A1. Hugo cut a swath of damage across the archipelago, destroying, among other things, approximately 90% of the telephone lines on St. Croix and 60% of the lines on St. Thomas. *See* Direct Case of Vitelco, Docket No. 90–124 (Apr. 6, 1990) at 2 (*"Direct Case"*), *reprinted in* Joint Appendix ("J.A.") at 56. Because of reductions in hardware capacity, Vitelco anticipated a dramatic decrease in demand for interstate access services. *See id.* at 1–2. Thus, Vitelco sought special permission from the FCC to increase its access service charges for the first six months of 1990. *See* Letter from Gertrude J. White, Counsel for Vitelco, to Judith A. Nitsche, Chief, FCC Tariff Review Branch (Nov. 16, 1989) (*"Application No. 1"*), *reprinted in* J.A. at 1.

In its request, Vitelco explained that the rule against retroactive ratemaking prevented Vitelco from waiting until the actual extent of the decrease became known before recouping its losses through higher rates. *See* Letter from Gertrude White to John Cimko, Chief, FCC Tariff Division (Dec. 1, 1989), *reprinted in* J.A. at 4. Instead, the company asked for permission to increase its switched and special access rates for the first half of 1990 while telephone systems on the islands were re-

stored. *See* Letter from Gertrude White to Donna R. Searcy, Secretary, FCC (Dec. 8, 1989) at 1 and Appendix A (*"Application No. 2"*), *reprinted in* J.A. at 8. The requested increase was designed not to compensate Vitelco for costs directly attributable to the hurricane (*e.g.,* hardware damage not covered by insurance), but to protect the company's income stream. *See id.* at 3–4; *Application No. 1* at 2–3.

In order to estimate the hurricane's effect on demand for access services, Vitelco analyzed demand data for August, the month immediately preceding Hugo, and October, the month immediately following Hugo. *See Application No. 2* at Appendix C. In addition, the company adjusted its projected minutes-in-use data to reflect a decrease in the number of access lines expected to be in service for the first six months of 1990. *See id.* Based on these and other adjustments detailed in the attachments to *Application No. 2,* Vitelco requested special permission to increase its interstate access rates for the first six months of 1990. At the end of that time, Vitelco's annual access tariff revisions, which were to be filed by the company on April 2, 1990, were to take effect as scheduled. To expedite matters, Vitelco also requested that the FCC waive its 45–day notice and supporting data requirements for standard rate revisions. *See id.* at 4.

On December 12, 1989, the FCC's Common Carrier Bureau ("the Bureau") notified Vitelco that it would grant the company's request for an interim rate increase. *See* Letter from John Cimko to Gertrude White (Dec. 12, 1989), *reprinted in* J.A. at 41. In addition, the Bureau agreed to waive the two procedural rules identified in Vitelco's application. *See id.* However, the Bureau emphasized that the Commission had not approved the interim rates and that the Bureau's letter allowing the rates to go into effect did not "prejudice any subsequent action which the Commission or Bureau may take." *Id.* Shortly thereafter, the Bureau issued an order in which it explained that it had granted Vitelco's request in order to preserve the company's pre-hurricane income stream and protect Vitelco's financial integrity. *See Virgin Islands Tel. Corp.,* 5 FCC Rcd 112 (1989). Nonetheless, "because the possibility exist[ed] for Vitelco to accumulate earnings above its authorized rate of return," the Bureau suspended the interim rates for one day, issued an accounting order, and initiated an investigation into the reasonableness of the rates pursuant to section 204(a) of the Communications Act, 47 U.S.C. § 204(a). *Id.* In its order designating issues for investigation, the Bureau explained that "the purpose of [the] investigation [was] to determine whether the [interim] rates may be excessive, *i.e.,* whether the rates ... produce revenues that exceed a revenue requirement that is computed in accordance with ... the Commission's Rules." *Virgin Islands Tel. Corp.,* 5 FCC Rcd 1622 (1990). In furtherance of the investigation, Vitelco was ordered to submit a "direct case" demonstrating that the interim rates were not excessive, including cost and demand data beginning September 1, 1989 and "ending with the most recent data available." *Id.*

As the company accumulated actual data from the first three months of 1990, it became apparent that the expected decline in demand had not materialized. *See Direct Case* at 10 ("demand for January and February of 1990 is higher than originally anticipated"). Indeed, demand over the first three months of 1990 was higher than Vitelco would have projected even in the absence of Hugo. *See* Supplement to Direct Case of Vitelco, Docket No. 90–124 (May 15, 1990) at 3 (*"Supplemental Direct Case"*), *reprinted in* J.A. at 73. Vitelco attributed the unusually heavy volume to the use of "coin telephones, customers sharing telephones with other residents and pent-up tourist demand." *Direct Case* at 11. In addition, because only about half of Vitelco's equipment was in service during the first quarter of 1990, Vitelco enjoyed a corresponding decrease in operating expenses. *See Supplemental Direct Case* at 3. As a result of the coincidence of heavy volume and diminished operating expenses, Vitelco's annualized earnings for interstate access services over the first three months of 1990 were in excess of

thirty-six percent; roughly three times the company's twelve percent authorized rate of return. *See Supplemental Direct Case* at Exhibit I.

This data became available to Vitelco as the company prepared to file its annual access rate revisions on April 2, 1990, in which the company would propose tariffs for the service year beginning July 1, 1990 (at the termination of the interim period). In response to its surprisingly strong earnings through the first quarter of the year, Vitelco "vastly" reduced its standard access rates. AT & T Response and Opposition to Direct Case, Docket No. 90–124 (June 14, 1990) at 3 (*"AT & T Response"*), *reprinted in* J.A. at 81. However, because the standard access rates did not take effect until July of that year, and "[b]ecause demand remained above forecast levels, the rate of return for the remainder of the period during which the [interim] rates were in effect continued to be above authorized levels." Further Direct Case of Vitelco, Docket No. 90–124 (Dec. 21, 1990) at 2 (*"Further Direct Case"*), *reprinted in* J.A. at 102.

In light of Vitelco's performance during the first half of 1990, the FCC concluded that Vitelco had "overearned" *during that time* and that the interim rates were therefore unjust and unreasonable. *Virgin Islands Tel. Corp.*, 6 FCC Rcd 7350, 7351 (1991) (*"Refund Order"*). In reaching its conclusion, the FCC did not find that Vitelco's demand projections in December of 1989 were based upon incorrect data, or that the company made erroneous calculations using that data. Nor did the FCC find that Vitelco's earnings from January 1, 1989 through December 31, 1990, had exceeded the authorized 12% rate of return for that period. Instead, the FCC simply "annualized" the return Vitelco had earned *during the six-month interim rate period* and found it to be above "authorized levels." *Id.* Consequently, the FCC ordered Vitelco to refund, with interest, any amounts earned during the six-month interim period in excess of the then applicable 12% rate. *See id.* at 7352.

On January 3, 1992, Vitelco filed a motion to stay the refund order so that it might seek agency reconsideration or judicial review. *See* Motion for Stay of Vitelco, Docket No. 90–124 (Jan. 3, 1992), *reprinted in* J.A. at 117. However, the company did not actually file its motion for reconsideration with the FCC until January 16, 1992, one day beyond the filing deadline established by section 405 of the Communications Act, 47 U.S.C. § 405(a). *See* Vitelco Petition for Reconsideration, Docket No. 90–124 (Jan. 16, 1992), *reprinted in* J.A. at 157. In an accompanying motion for leave to file a late petition for reconsideration, Vitelco explained that the untimeliness of the petition resulted from "miscommunications within the undersigned counsel's law firm, which was wholly the result of error on the part of undersigned counsel." Vitelco Motion to File Petition for Reconsideration One Day Late, Docket No. 90–124 (Jan. 16, 1992), *reprinted in* J.A. at 149. In a separate filing, Vitelco argued that the Commission should treat its motion for stay as a timely filed petition for reconsideration. *See* Vitelco Reply to Opposition, Docket No. 90–124 (Jan. 31, 1992) at 6–9, *reprinted in* J.A. at 193. While these motions were pending, Vitelco filed a petition for review of the refund order, No. 90–1063, with this court.

The FCC eventually granted Vitelco's motion to stay the refund order, *see Virgin Islands Tel. Corp.*, 7 FCC Rcd 4235, 4237 (1992), declined to consider the stay motion as a timely filed petition for reconsideration, denied Vitelco's motion to file one day late, and dismissed Vitelco's petition for reconsideration as untimely. *See Virgin Islands Tel. Corp.*, 7 FCC Rcd 4238 (1992). On August 10, 1992, Vitelco filed another petition for review with this court, No. 92–1347, this time challenging the FCC's dismissal of its motion for reconsideration. We have consolidated the two petitions and herein resolve both.

## II.  DISCUSSION

### A.  *The Dismissal of Vitelco's Petition for Reconsideration*

█ Because of the Commission's dismissal of Vitelco's petition for reconsidera-

tion, a number of the arguments briefed before this court were not presented to the FCC. Yet, it is fundamental that issues must be raised before the Commission as a prerequisite to our review. *See* 47 U.S.C. § 405; *Action for Children's Television v. FCC,* 906 F.2d 752, 755 (D.C.Cir.1990). Thus, unless the Commission unlawfully dismissed Vitelco's petition for reconsideration, the arguments that Vitelco failed to raise below are procedurally barred.

■ Section 405 of the Communications Act provides that petitions for reconsideration must be filed within thirty days of the date on which the FCC action complained of takes place. 47 U.S.C. § 405(a). Here, Vitelco indisputably missed its filing deadline. The refund order was issued on December 16, 1991, and Vitelco's petition for reconsideration was not filed until January 16, 1992—31 days later. Although section 405 does not absolutely prohibit FCC consideration of untimely petitions for reconsideration, we have discouraged the Commission from accepting such petitions in the absence of extremely unusual circumstances. *See Reuters, Ltd. v. FCC,* 781 F.2d 946, 951–52 (D.C.Cir.1986). In this case, extenuating circumstances did not prohibit Vitelco from filing within the prescribed time limits. Vitelco's counsel freely admits that its tardiness was caused by miscommunications within the firm. Therefore, the Commission's refusal to entertain Vitelco's petition for reconsideration was justified.

Nonetheless, the foreclosed issues are not those that are central to the disposition of this case. Vitelco's fundamental complaint on appeal is that the FCC's decision to evaluate the reasonableness of the company's interim rates over a six-month period was arbitrary and capricious. This issue *was* raised repeatedly before the Commission throughout the administrative proceedings. *See, e.g., Further Direct Case* at 2–3 (use of six-month monitoring period inconsistent with Commission precedent); Rebuttal of Vitelco, Docket No. 90–124 (June 28, 1990) at 5 (Commission should not use an abbreviated review period for interim rates), *reprinted in* J.A. at 90; *Direct Case* at 11–12 (monitoring period for the interim rates should be April 1, 1989 to July 1, 1990); *Supplemental Direct Case* at 3 (conclusions concerning the interim rates cannot be reached "until the appropriate monitoring period is determined"). Thus, when the Commission finally disposed of the case, it *did* pass on the issues that are the focus of this dispute. *See Refund Order,* 6 FCC Rcd at 7351 (holding six-month review period appropriate and rejecting Vitelco's "good faith" forecasting argument). We have no difficulty in concluding, therefore, that the matters upon which our decision hinges were adequately raised before the Commission and are properly cognizable by this court.

B. *The Merits of the Commission's Decision*

■ Under the Commission's rate-of-return prescription rules, the earnings of local access carriers are evaluated over consecutive two-year periods that begin on January 1 of odd-numbered years and end on December 31 of even-numbered years. 47 C.F.R. § 65.701(a); *see also Ohio Bell Tel. Co. v. FCC,* 949 F.2d 864, 870 (6th Cir.1991) ("Commission's practice is to review earnings over a two-year period"); *MCI Telecommunications Corp. v. Southern Bell Tel. & Tel. Co.,* 5 FCC Rcd 1954 (1990) (two-year monitoring period is "existing Commission policy"). The two-year review period allows the Commission to monitor interstate access rates while still providing carriers an opportunity to respond to changing market conditions with mid-course rate revisions. For instance, Vitelco's annual access rates were revised in July of each year. Thus, within each two-year monitoring period, the company would normally have two scheduled rate revisions to correct for excessive or inadequate earnings.

In this case, Vitelco attempted to use its rate revision opportunities to keep its earnings within the permissible range. In its annual access rate filing in April, 1990, Vitelco significantly reduced the rates that

were to take effect in July, 1990.[2] Since Vitelco only had data for the first three months of the year, and since a full one-fourth of the standard monitoring period remained after the interim period (July to December, 1990), it was not unreasonable for Vitelco to believe that it could reduce its earnings over the two-year review period to an acceptable level. Indeed, this case is a prototypical example of the kind of situation in which the two-year monitoring period should protect carriers from having their rates adjudged based on unforeseen and unforeseeable earnings variations over short intervals.

Thus, it was unremarkable when, throughout the administrative process, the Commission appeared to embrace its standard practice of evaluating carrier earnings over a two-year period. For instance, in the order suspending the interim rate, the Bureau explained that the purpose of the ensuing investigation was to determine whether the interim rates would allow "Vitelco to accumulate earnings above its *authorized rate of return.*" *Virgin Islands Tel. Corp.,* 5 FCC Rcd at 112 (emphasis added). Similarly, in its order designating issues for investigation, the Bureau explained that "the purpose of [the] investigation [was] to determine whether the [interim rates] may be excessive, *i.e.,* whether the rates ... produce revenues that exceed a revenue requirement that is computed in accordance with ... the Commission's Rules." *Virgin Islands Tel. Corp.,* 5 FCC Rcd at 1622. Thus, throughout the investigation, it appeared that Vitelco's earnings over the first six months of 1990 would be factored into the FCC's standard bi-annual evaluation, covering January 1, 1989 to December 31, 1990.

The surprise came when the Commission rendered its ultimate decision in the case. In that decision, the Commission concluded that Vitelco had earned in excess of "its authorized return during the January–June 1990 period." *Refund Order,* 6 FCC Rcd at 7351. Given the structure of rate-of-return prescriptions, the Commission's con-

clusion is a nonsequitur. Under the present system, the target "authorized return" is a number that has meaning only in relation to the full two-year monitoring period. Thus, it makes no sense to speak of the "authorized return" for the January–June, 1990 period. The Commission's reasoning is analogous to that of a parent who admonishes his child not to eat more than one candy bar per day, and then concludes that the prescription has been violated when he observes the child eat the first half of a candy bar in less than one minute. The "one-candy-bar-per-day" rule, like the "authorized return" rule, only has meaning with respect to the predetermined period of time. As the "authorized return" rule is presently formulated, that period of time is two years. If the Commission is allowed to uncouple the rate-of-return percentage from its temporal mooring without warning or explanation, the meaningful constraints that rate-of-return prescriptions provide turn into *ad hoc* limitations governed only by the preferences of the decisionmaker.

This case exemplifies the evil of ignoring the temporal dimension of rate-of-return regulation. Here, the Commission's narrow focus on Vitelco's earnings during the first six months of 1990 led it to exclude from consideration alleged underearnings during 1989. *See Direct Case* at 12. Similarly, the imposition of an arbitrarily short monitoring period precluded consideration of Vitelco's annual access rate revisions and their effect on earnings over the remainder of 1990. Thus, although Vitelco's projections were apparently made in good faith and were based on the best available information, the Commission ordered a refund of "excessive" earnings over a limited period of time simply because those projections turned out to be wrong. The Commission attempts to defend the abbreviated monitoring period used in this case by linking it directly to the period of time that Vitelco's interim rates were in effect. *Refund Order,* 6 FCC Rcd at 7351. However, this conflates two independent time frames—the period during which a rate is in effect and the period over which a carri-

---

**2.** The record indicates that Vitelco reduced its switched access rates by 43%, its switched trans- portation rates by 25%, and its special access rates by 27%. *AT & T Response* at 4.

er's earnings are measured—without reason or explanation. In order to assess the reasonableness of Vitelco's earnings as against the authorized rate of return, the Commission was required to consider earnings for the entire period during which the authorized rate was in effect.

The arbitrariness of the Commission's refund order is highlighted by the FCC's apparent disregard for past practice. Prior to the conclusion of the Vitelco investigation, the Commission had an opportunity to pass on another set of interim rates. *See Investigation of Special Access Tariffs of Local Exchange Carriers*, 5 FCC Rcd 1717 (1990) (*"US West"*). In *US West*, the Commission declined to evaluate the carrier's special access rates, which had been in effect from April to October, 1985, in terms of a six-month monitoring period. *See* 5 FCC Rcd at 1718–19. The similarities between *US West* and this case are striking. Just as in *US West*, the rate schedule at issue in this case was designed to respond to a unique set of circumstances—here, the destruction of a majority of Vitelco's lines by a natural disaster. Vitelco's rates were expressly interim and were, like the rates in *US West*, the first of their kind to be filed by the company. Finally, just as in *US West*, the company filed for a downward rate revision barely three months into the interim rate period. Indeed, the Commission itself explicitly recognized the similarities between the two cases. *See Refund Order*, 6 FCC Rcd at 7351 (interim rates in *US West* were first of their kind, were revised three months into access period, and were based on unique circumstances). Nonetheless, the Commission concluded that *US West* was not controlling because, "Vitelco increased rates during the access year for the sole purpose of avoiding underearnings that did not occur." *Id.* at 7351.

We are unpersuaded by the Commission's attempt to distinguish *US West*. The Commission's reasoning may be reduced to a single proposition: Vitelco is liable for "excessive" earnings because, with the benefit of hindsight, the Commission has found that the company was wrong when it projected a decrease in demand. This proposition, though, contravenes the fundamental principles underlying rate-of-return regulation. Naturally, any time a carrier's interim rates, set to offset anticipated shortfalls, generate greater than expected returns, it will follow that the interim rates were not necessary to protect the carrier's income stream; that is, the carrier miscalculated. Under the Commission's construction, a refund in such a situation would always be warranted—*i.e.*, interim rates that generate earnings in excess of the standard rate of return are *per se* unreasonable. Yet, this leads to the same systematic bias against carriers—forcing carriers to disgorge excess profits, but absorb shortfalls—that we held unlawful in *AT & T*. Thus, the fact that the projections upon which Vitelco's interim rates were based turned out to be wrong is not sufficient to distinguish the present case from *US West*.

Not only has the FCC failed to take into account the temporal dimension of rate-of-return regulation, but it has also ignored the factors that should be considered in determining whether remedial action is necessary. As we explained above, the Commission's prescribed rate of return is not Mosaic law, but a single point within a broad range of reasonable rates. Furthermore, the prescribed rate of return is but "one component" of a carrier's tariff schedules. *Nader*, 520 F.2d at 201. Projected operating expenses, market forecasts and competitive conditions must also be considered by carriers when they settle on a final access rate. Given this multitude of inputs, the prospective selection of a tariff that will generate the prescribed rate of return is necessarily an imprecise endeavor. Thus, once the Commission finds that a carrier has exceeded (as a pure mathematical matter) its prescribed rate of return, it should then consider other relevant factors in determining whether a rate is unreasonable and a refund warranted. *See Las Cruces TV Cable v. FCC*, 645 F.2d 1041, 1047 (D.C.Cir.1981) (Commission must consider all relevant factors in ordering refunds under section 204).

Naturally, the specific factors to be considered in any given case will vary with the circumstances. However, a few general categories of concerns will nearly always be relevant. For example, in the past, the Commission has considered whether the carrier's projections were reasonable at the time they were made. *See Public Serv. Comm'n v. The Chesapeake and Potomac Tel. Co.*, 5 FCC Rcd 5518, 5519 (1990) ("unique forecasting difficulties justified "dichotomy" between projected and actual earnings). Likewise, the actual harm suffered by ratepayers should be weighed in any refund decision. *Las Cruces TV Cable*, 645 F.2d at 1047; *see also Communications Satellite Corp.*, 3 FCC Rcd at 2646 ("customers' failure to file petitions or complaints ... is also a relevant factor"). Furthermore, prior to ordering a refund, the Commission will likely want to take into account changes in the market environment. *See Communications Satellite Corp.*, 3 FCC Rcd at 2646; *see also Nader*, 520 F.2d at 205 (prescribed rates cannot remain binding "during periods of rapidly changing economic conditions"); *cf. Western Union Tel. Co.*, 95 FCC 2d 881, 910–11 (1983) (competitive forces substantially justified excessive earnings). Finally, the Commission must factor overriding equitable considerations into any refund decision. *Las Cruces TV Cable*, 645 F.2d at 1047; *see also Communications Satellite Corp.*, 3 FCC Rcd at 2646 (Commission's inaction could have misled carrier). Although the ultimate decision to order a refund lies within the discretion of the FCC, courts are duty bound to look "closely to see if the agency [has] considered relevant factors and if it [has] struck a reasonable accommodation among them." *Las Cruces TV Cable*, 645 F.2d at 1047. Though we do not intend to describe an exhaustive or mandatory list of considerations, we can find no indication that the Commission weighed any of these factors when it issued its refund order to Vitelco.

In short, Vitelco was justified in assuming that the Commission would evaluate earnings over the relevant "authorized return" monitoring period; the earnings over the interim rate period being but one factor in the calculation. Although we decline to say that the Commission may never adopt a monitoring period that mirrors an interim rate period, its decision to deviate from the standard two-year monitoring period in this case was unforeshadowed and unjustified. Therefore, the Commission was bound to evaluate Vitelco's earnings in light of the company's two-year earnings performance.

## III. CONCLUSION

Although the Commission was well within its discretion in deciding to dismiss Vitelco's petition for reconsideration, the central questions upon which our opinion turns were adequately raised below. Based on our review of the administrative record and the rate-of-return prescription system, we hold the Commission's unjustified departure from its prior rate-monitoring practice to be arbitrary and capricious. Therefore, petition number 92–1374 is denied, petition number 92–1063 is granted, and we remand this case to the Commission so that it may reevaluate Vitelco's earnings over the correct measuring period, January 1, 1989 to December 31, 1990.

RANDOLPH, Circuit Judge, dissenting:

Anticipating a decline in demand for its services in the wake of Hurricane Hugo, Vitelco sought interim six-month rate increases to make up the difference. Vitelco described its request as a short-term emergency measure, necessary "to ensure the financial integrity of the Company." Letter from Gertrude J. White to John Cimko, Chief, FCC Tariff Division 1 (Dec. 1, 1989) ("Cimko Letter"). Despite Vitelco's failure to present adequate data to support its assertions, the Commission allowed the increases, subject to a refund if investigation showed the interim rates not to be reasonable. The Commission's investigation, conducted a few months later, conclusively showed just that. Rather than a decline in revenues, Vitelco enjoyed a large increase. My colleagues nevertheless set aside the Commission's order requiring Vitelco to refund the overcharges. I therefore dissent.

The Commission's mistake, as the majority sees it, was in evaluating Vitelco's earnings during the time the increased rates were in effect rather than over the conventional two-year monitoring period. The idea is that the Commission's departure from its normal course caught Vitelco by "surprise." Maj. op. at 1238. One is reminded of General DeGaulle's quip: since politicians do not believe what they say, they are quite surprised to be taken at their word. Vitelco's complaint is a horse of the same color.

At Vitelco's urging, the Commission waived 47 C.F.R. § 61.38's demand for extensive supporting data to justify rate increases. The Commission did so in light of Vitelco's representation that the company "will be able to furnish to the FCC a complete update of revenues, expenses and rate base as part of the tariff filing due on April 1, 1990. At that time, sufficient information concerning the recovery effort from Hurricane Hugo will be available to respond to FCC requirements." Letter from Gertrude J. White, Vitelco counsel, to Judith A. Nitsche, Chief, FCC Tariff Review Branch 2 (Nov. 16, 1989); *see also* Letter from Gertrude J. White to Donna R. Searcy, Secretary, FCC 4 (Dec. 18, 1989). Rather than passing upon Vitelco's request beforehand, the Commission deferred final judgment until Vitelco furnished the data. And the Commission did so in the face of Vitelco's recognition that, in the company's words, "in the unlikely event that usage returns to pre-hurricane levels in the very near future," the Commission can take action "to guard against potential overearnings." Cimko Letter at 1–2. These statements make sense only if Vitelco expected the Commission to evaluate its earnings, not over a two-year period, but during the time the interim rates were in effect. Vitelco indeed invited such an evaluation as the *quid pro quo* for the Commission's waiving its rules. The Commission's final decision therefore came as no surprise to the company. Having allowed the interim rate increases to go into effect "subject to an investigation and an accounting order put in place specifically to protect ratepayers should the decline in demand predicted by Vitelco not materialize," the Commission simply ordered refunds when Vitelco's prophesy did not come true. *Virgin Islands Tel. Corp.*, 6 F.C.C.R. 7350, 7351–52 (1991).

Unlike the situation contemplated in *American Telephone & Telegraph Co. v. FCC*, 836 F.2d 1386, 1391 n. 5 (D.C.Cir. 1988), Vitelco was not seeking increased rates as an adjustment to its authorized rate of return after experiencing shortfalls over, say, the first twelve months of the two-year monitoring period. Instead, "Vitelco increased rates during the access year for the sole purpose of avoiding underearnings that did not occur." 6 F.C.C.R. at 7351. In further contrast to *AT & T*, the refund order here does not condemn Vitelco to suffer underearnings in the long run, the medium run, or even the short run. On this point, the Commission's answer to Vitelco—and now to the majority opinion— strikes me as conclusive: "The *Refund Order* requires only a one-time refund of charges assessed during an extraordinary six-month period chosen by Vitelco itself for special treatment. Even after Vitelco implements that refund, the company will still have earned at *or above* its rate of return for that period." Brief for Respondents at 32.

As to *US West*, my colleagues find the similarities between it and this case "striking." Maj. op. at 1239. I find them nonexistent. The rates in *US West* "were part of a partially new regime.... [They] were allowed to take effect at the conclusion of a comprehensive investigation of US West's and other local exchange carriers' initial attempts to tariff interstate access services in accordance with the Part 69 access charge system." *Investigation of Special Access Tariffs of Local Exchange Carriers*, 5 F.C.C.R. 1717, 1718 (1990). Vitelco's interim rate increases were nothing of the sort. The Commission properly analyzed Vitelco's interim rates in terms of the limited objective Vitelco defined for them. The interim rates rested not on any "comprehensive investigation," but on Vitelco's predictions, predictions the company admitted lacked adequate supporting data. And in

*US West,* the Commission explicitly cautioned against taking its decision to mean "a six month period could [n]ever establish an adequate basis to measure compliance with a rate of return prescription." *Id.*

This should have been a simple case. No great policy issues were at stake, no fundamental principles hung in the balance. Vitelco thought a hurricane's destruction threatened its financial integrity. The Commission allowed a temporary rate increase on condition that the telephone company back up its forecast of dire need with facts, as it said it would. When Vitelco could not do this, the Commission—taking Vitelco at its word—properly ordered the company to refund the increased charges. I would deny the petition for review.